Case No. 16-1370 et al. Prime Healthcare Services, Encino, LLC DBA, Encino Hospital Medical Center and Prime Healthcare Services Garden Grove, LLC, DBA, Garden Grove Hospital and Medical Center, Petitioners v. National Labor Relations Board Mr. Kahn for Petitioners, Mr. Seltzer for the Respondent, and Ms. Demidovich for the Intervenor Good morning Good morning, Your Honor Your Honors May it please the Court Jamie Kahn, with my colleague Jonathan Batten of the law firm DLA Piper representing Petitioner, Prime Healthcare Services dash Encino, LLC, doing businesses in Encino Hospital Medical Center In July 2017, while briefing for this case was ongoing, Prime and UHW, the other union that was previously involved in this case, entered into a settlement agreement and the portion of this appeal regarding UHW, which was the bulk of this case, really, was severed and dismissed. What remains are two basic collective bargaining agreement related issues on which the Board erred below. An alleged post-contract expiration change by Encino Hospital to the status quo and an alleged failure by Encino to provide information to 121RN during bargaining. First, the Board made a fundamental error in its application of the status quo doctrine to the contractual wage increases by ignoring national labor policy and by applying the clear and unmistakable waiver standard to a contract coverage issue. So something else happened in 2017. We handed down the decision at Wilkes Bar, right? That's right, Your Honor. So, at least on the wages side, the step-up side, annual anniversary step this sure looks a lot like that case. How do you get out from under that? I don't disagree, Your Honor. This does look a lot like Wilkes Bar. I think there are two primary ways in which Your Honor said how to get out from under Wilkes Bar and how we distinguish Wilkes Bar. One is that the language of agreements is distinct, and I will return to that. But more importantly, Wilkes Bar, and I understand it's a decision of this Court, and two of the judges sitting on this panel were part of that decision, we submit was a bridge too far. One went just one step further than we think is appropriate under national labor policy. Of course, we can't do a whole lot about that, right? We're not the unbanked court. We follow Wilkes Bar. I understood, Your Honor. I think there's still some distinctions between Wilkes Bar and this Court, but the reasoning... So you acknowledge that even though you don't like the precedent, you're in trouble with respect to it? Yes, Your Honor. When you say it's a bridge too far, can you say what it is that... Sure. Yes, Your Honor. I'll start with the premise underlying Wilkes Bar and the line of cases on which it relies, whether it's Katz in the 50s or Litton is the status quo. The full phrase in status quo rests ante bellum, in the status in which things were before the war, the Latin phrase. Here under labor policy, in the status things were before bargaining started. The status quo that should have been applied in Wilkes Bar and should apply here is the status quo at the day the contract expired. When the contract expired, wages were set. That is what Katz said. That is the way Litton reads. It is not to apply a standard in which the status quo changes over time. I think what the labor board has said is a dynamic status quo. Instead, it is to apply a standard in which things are set at that time so the parties can then bargain. If the board or this court instead insert themselves into that agreement and determine what terms should apply going forward and what they should change to be, we are stepping into the collective bargaining relationship. I thought the inquiry was a little bit more basic and that is you look at the agreement and see what they've agreed to. It is not a matter of rewriting the agreement or inserting new terms in it. It is seeing what is the agreement. The ALJ and the board here thought that the agreement, the language of the CPA anticipated that the anniversary step up would continue after the expiration and didn't with the across the board. I will take your question on the contract in this case not Wilkes-Barre. I think the word you used is critical. It is anticipated. They anticipated what would happen. Not what the agreement said. The agreement said there are wage increases. Article 13, Section A. There are subparts. Section A is wage increases. There are three definite wage increases on certain times during the agreement under A3 and A5 which is referencing back to A3 says there are also as a component of those wage increases anniversary increases but the agreement looks to the three definitive time periods and for the board or the ALJ to say... The step increases which are automatic can't go beyond a certain level if three is in existence but that's not going to be a problem if three is not in existence once the contract expires but five is the step increases just continue. I disagree. I know you disagree and it's interesting you start by acknowledging that Wilkes-Barre pretty much controls and I think it does control. I couldn't say otherwise Your Honor. Is this court's decision? The problem is if it controls. It's the law of the circuit and that's that. Except for this. This is a distinguishable case. One if we think Wilkes-Barre is wrong we decide if it's second it's distinguishable. That's not going to get you anywhere. I understand that Your Honor. There's no need or laboring over that. It's the law of the circuit. I don't know what you're saying that's distinguishable. What's distinguishable? Here Your Honor we have a provision if you're looking at the... One you have a complete provision in section A under section 13 or article 13 section A which deals with wage increases. We and as the Supreme Court and this court has said previously you look at the whole contract. Well let's look at the whole of section A. There is no question and the board and the union 121RN here have never suggested there should be additional increases under three and when we submit this court and submit to the board that section five is connected to and we cannot parse and should not parse out those provisions. They are one and the same. They are connected. They're not one and the same. They're two distinct provisions and all that five says is subject to the annual caps provided in three. That's all. Okay Your Honor. Alright so if you're past the expiration date of the contract you're not going to have to worry about the annual caps in three because they now stop. So that's all that five does is incorporate in three. Five otherwise continues. You're in a step increase program and when you're at the next step you can continue. Again Your Honor I think five does not continue. Status quo means set as of the end of the contract. There are only two cases of which we're aware. At the end of the contract you have a step program and there's nothing that says that the step program stops at the end of the contract. There's nothing in this contract that says that. And that's the point of the status quo doctrine is that it should have been set at that time as exactly the wages were in place. Under Your Honor's theory if there was a wage increase. Meaning I on my appropriate date get an automatic step increase. That's my wage. I'm making x now and when my step increase time comes I get y. That's who I am at that moment when the contract expires. That's what I have which you can't change without negotiating. And there's nothing in the contract to the contrary. I mean I hear what you're saying and at least under the law of the circuit you're absolutely wrong and I actually think you're wrong with respect to all of the other cases to which you would like to refer. But I mean what I have in five is I have a program of step increases. You can change it during collective bargaining but it's still there. And until you change it, it stays in place. Well that's an interesting point Your Honor. It has been changed. There is a new agreement in place. In fact the parties are negotiating another agreement it was an agreement entered into in November 2014 which had step increases in place over the duration of that agreement. Had retroactivity relating back. The agreement we're arguing about now, I mean the issue is moot. There was an agreement that's been in place from 2014 I think the parties are negotiating. I'm not familiar enough to tell you more than that. I'm sure counsel for 121RN is which brings me to the second reason we're here, the information requests. That also is a moot point. The parties have negotiated throughout 2013 or 13, 12, 13, 14 and entered into an agreement which moots any of the information requests that 120RN was seeking and are still at issue before the court today. Does the new agreement include the so called confidential and proprietary information that was sought? The new agreement doesn't. You say it's mooted. The issue before us is whether the union is entitled to what you refer to as proprietary and confidential. Are you telling us that an agreement has been ratified? I would believe so, Your Honor. I'm not saying that they have received the information. I'm not saying that. What I'm saying is that the parties negotiated a collective bargaining agreement, have entered into. It has been ratified as of November 2014 and again, if I'm wrong, please correct the dates. That agreement includes benefits. It includes an EPO plan which is the benefits issue we were dealing with in the information requests which is free to all employees of Encino. There is no cost associated with that EPO plan. And did the hospital offer accommodations to address its concerns at the time when the information request was pending? No. I thought that was clear under our precedent that it was... Oh sorry, did the hospital, Your Honor? Yeah, that it was the hospital burden to do that. Well, we hadn't got to the point, Your Honor, we think of it being at the stage where it needed to offer accommodations. We still were not comfortable with, and I believe this is demonstrated in the back and forth communications between Ms. Schottmiller and Ms. Song, of the relevance of the information. It depends on which one of the categories you're talking about, Your Honor, but let's talk about the... I'm thinking about the claims information, which I thought was sort of the focus. There are three subcategories of information. One is what was Encino's cost of providing the benefit. One was what is the utilization of outside providers. And one was, well, we're also looking for the MS-DRG information, that's medical severity diagnosis review. I'm going to show you the camera where the G is. Essentially, it's your Medicare coding. And the 121RM wanted that for every visit by any patient at the hospital. They wanted to know exactly what every single patient was admitted for and for how long they stayed, and essentially what was the coding. So depending on which one of the categories you're asking about, Your Honor, that information was not provided. We argued that... What was the third thing? The third thing is MS-DRG, essentially it's the Medicare coding information. That is, so when a patient visits the hospital, or really visits any, not just the hospital, any medical provider, there's coding that's done by the medical staff to determine what exactly what is being treated for. But that's all it shows, what is being treated for, data omission, et cetera. It doesn't show... Go ahead, Your Honor. I'm sorry. I'm sorry, I didn't mean to interrupt you. Your position is that there's sort of two stages to the analysis, and the first stage, the onus is on the union in requesting the information to establish that it's relevant to their obligations in representing their members, and relevant to bargaining. And then once you're satisfied that the information, that they've made a relevance case, then under our decision in the United States Testing Company, the onus would be on your client to establish, to say, you know, we've got some proprietary and confidentiality issues here, how about we provide it to you in such and such a manner? And your position is that second, you never had that obligation because you weren't satisfied with the relevance case that the union had made. Yes, Your Honor, and it may actually be three steps, depending on what the information requested is. Maybe it's presumptively relevant, and then we rebut. Why isn't this presumptively relevant? They're negotiating about coverage, and I think one of the things, even if the default, or the sensible thing with these employees is that they be covered by their employer's services, at least as the default, they're trying to figure out what that's worth to their membership, and therefore, you know, I mean we all know these plans look good on paper, but then when you actually go and try to get the services, you know, how does it actually roll out in their members' experience? Wouldn't that be presumptively relevant information? So that, I think, is what you characterized, Your Honor, may have been, but that's the SPD or summary plan description. What does the benefit cover? How are you receiving the benefit? No, no, no, I'm actually saying what the people who were the beneficiaries of the plans, what was the cost of providing the services pursuant to their claims, and what was their utilization of outside providers, and what was actually the track record, was what I understood roughly to be. No, I think that is the request. My point, Your Honor, was that what I thought you were saying was a little different. I would have said, yes, the summary plan description, presumptively relevant, provided, but when you look at the cost of providing health care benefits, this is not an insurance plan. We cannot, because we are a health care provider, we are a hospital, and PRIME is a hospital operator, we can't say it costs us X dollars per employee because that's what we're paying the insurance company. When the claim comes in, it's self-insured. Claim is $1,000, insurance covers X, which is self-insured, and we can tell you it costs us X, and we can just say, here's a math for you. Why isn't that relevant? Why is that not relevant? If we had been a normal employer, not a health care provider, not a hospital that is just doing business as providing health care, the courts have said, I think, clearly, the cost of providing benefits is relevant, but every one of those cases is our insurance cases. I see. So you're saying because you're actually providing the services, those costs aren't relevant? See, I would think they would almost be more relevant, because it's not just one sticker price. It's, hey, we're providing you actual services, and it may seem like a little thing when you come in and get your infection checked out, but actually, in terms of sticker price on that claim, for them to know, hey, that's a benefit our members are getting, and we can value it accordingly, it would seem to me that it's actually more relevant than just the cost of an insurance benefit, which is a relatively standard thing. You're saying, what are we actually, services? That gets the issue we were dealing with, which is the only way for Prime, or Encino in this case, to get that number, essentially to do a full financial analysis of its, starting, let's say, with the hospital cost of operating, drilling down to what it costs a doctor to put a band-aid on you. Those numbers don't exist like they do in the insurance context, because we're not just writing a check. It's a full breakdown of the profit-loss system to get to the profit number. Right. So, that's a little bit, I mean, I understand that to be wrapped up in the objection you did make, which is that this is proprietary information, but I didn't take you to be saying, and we don't have it in that form. It would require us to actually generate... If I'm remembering the record correctly, Your Honor, I don't believe, and I'd have to look at the record to say for sure, but I do not believe the hospital ever said it did not have the information. That's not the issue, is it? Your issue is that you'd be giving away proprietary information and how the hospital makes its money. Is that right? It's that, Your Honor, and it's also the relevance of the testament. The context of these requests was, one, that the union had never asked for this information before. Our chief bargainer at the time, chief negotiator, who'd been doing this for many, many years, had never received requests like this before, and we were in the middle of a very nasty corporate campaign from an affiliate of 121RN who had made similar requests. This is, we're reading the requests together, and they had used the information they were seeking from Prime's other hospitals to attack Prime publicly to stop it from growing. This is the part of the case that's now been settled out, so I don't want to belabor those points, but that's the context. So when we were looking at these requests coming in, and when our chief negotiator went to the chief nursing officer and said, is there any relevance to these requests? The expert at the hospital said, absolutely not. There is nothing this information will tell you about bargain care. But if we disagreed with you on the relevance and we're just focusing on whether it's proprietary information, when did you first raise that objection? I couldn't find any reference to it in the correspondence that you had objecting to it. I believe, Your Honor, I'd have to look and certainly can submit to you. I believe it's in the second letter from Ms. Schottmiller. She mentions that this would essentially, this is just now the first request, would essentially require us to disclose profit loss data. I think that's as far as it went, and then there was additional back and forth, because again, we're looking at all the requests together. So I don't know if anyone ever said this is proprietary information. I think it was done more in the past. See, the interesting thing is, if you had raised, you switched the argument. If you had raised this is unduly burdensome to no good end, that's a viable claim below, as I recall, the information cases. That's why I was listening carefully and surprised to hear it, because I didn't remember that being raised. I can't change the facts as they are. No, I'm not suggesting anything bad about what you've done, but I mean, that's the problem, is that's not the claim you raised, and it's not one that we're really looking at, and it's presumptively relevant. I mean, cost of medical care, I mean, the case is presumptively relevant. That's the way we first look at it, so you kind of stuck with the proprietary. I would say, Your Honor, again, the point I was making earlier, because of the type of employer we are, it is not presumptively relevant in this case. This is not an insurance case. All the other cases that talk about presumptive relevance in a benefit-cost context are in health insurance cases. This is not an insurance plan at all, and to underlie the lack of relevance of this type of information, the parties bargained over and entered into a collective bargaining agreement that, under which I apologize, this is not in the record, but under which Encino, in this case, is offering and the employees agreed to take the EPO claim at zero cost. There is no relevance to that decision. Prime had told them we were only offering EPO. We're not going to let you go out of network or take a different provider. We are a health care provider. If I'm Ford, I'm not going to give you money to go buy a GM. Are they related now? I don't think they are. So that was the context. So I think in this distinct context of a health care provider with a, not even a self-insured plan, but a health care provider under which they're providing benefits directly themselves just during the course of doing business, it's not presumptively relevant. Mr. Khan, in terms of the potential misuse of the information, as you said, one of the things that was animating Encino's response was the past experience. Is there anything that one can lawfully do in a situation like that when handing over information to guard against different uses of it, or does it all just turn on relevance? In the context of potential misuse, I think that the board's case law hondo would say you don't have to turn that over. If there is a purpose for which, here in this case, it would be significantly detrimental to the hospital. What if it's dual purpose? I mean, what if they say, as they did here, this is relevant and we need it, and that's assuming for purposes of hypothetical, but that is just true. It is relevant and they do need it. And it also is susceptible of being used in a way that you find. Then what is the law on that? I think the law is what hondo says. There are dual purpose cases. I'm sure that's what your Honor is referring to where a union may have a different purpose, but the distinction here is it's not just it's a different purpose. Here the concern Prime had and Encino had was it was a purpose that was going to immediately, or we believe to be the case at the time, and do not believe that to be the case anymore. We've resolved the issues with UHW, but it would be used to the significant detriment of the Prime Healthcare operations, including Encino, to the detriment of the actual employees. Right, I understand that's your position, but I'm saying what's the law on if both things are present, potential detrimental use, their judgment is otherwise, they don't think it's detrimental, but potential detrimental use in your view, but also clearly relevant to bargaining. What's the law on how you, what happens in that situation? I believe the board addressed this in hondo and said you don't have to provide it. I believe hondo says you don't need, in that instance I'm not sure that hondo made the relevance decision, but there is not an obligation to provide it in that very unique context. It's a limited context. I agree with your Honor. We don't believe the NSDRG data is relevant here given it has nothing to do with quality of care. It's just really admission information for the hospital in its entirety, not just for the 121RM members. Can I read you, in the ALJ opinion, the ALJ said if Encino was concerned about the potential disclosure of proprietary cost information to competitors, it was obligated to timely raise those concerns and seek an accommodation with the union. There is no evidence that it ever did so. Is that wrong? Was the ALJ wrong? I think that's correct. You believe that is correct? Okay. Thank you, Your Honor. We'll give you back a couple minutes. Good morning. Good morning, Your Honors. May it please the Senate Board of Courts. Greg Soter for the National Labor Relations Board. Your Honors, we represent that the board is finding the unlawfully rescinded step increases is supported by substantial evidence regardless of which analytical framework applies here. Can I ask you a threshold question? Yes. Because I recall you don't cite Wilkes-Barre. No. Why not? We don't cite Wilkes-Barre. I apologize for that. The reason is that it's because it was a result of the very last minute settlement between Prime and UHW. Our brief was due, I believe, a month before Wilkes-Barre issued, and we had it ready to go. Then the settlement happened four months later. I came back to the brief. I stripped everything out that had to do with UHW. I checked my sites to make sure they hadn't been overruled, but I did not do any additional research. I just didn't know if that was some signal. No, that is not a signal of any sort. In fact, we certainly agree with the Union in this case that Wilkes-Barre is the determinative and governing case, and that any sort of factual differences that Prime may point to are negligible, and really what we have here, as in Wilkes-Barre, are two contractual provisions that create distinct rights that operate independently of each other, and that therefore you have one, the annual increase provisions, which ends with the contract, which is limited to a time certain, and then the other step increase provision, which is open-ended and tied to the employment of each individual employee, and therefore it continues that way after the contract expires. On one point that Mr. Kahn was making, the status quo point, I believe the court actually specifically rejected that argument in Wilkes-Barre when it said, at page 374, it said that what the hospital was arguing was essentially that to define the status quo, you have to take a snapshot of each individual employee's pay on the end date of the contract, and that's not what you do. What you do is you take the contract as it exists on that last day, and you import those terms forward, and as the contract existed on that last day, you had a set of wages corresponding to each nurse category and their levels of experience, and that grid continues to exist going forward once the contract expires, and that's why you have, even though you are stuck in terms of the basic wages for each level, those will not continue to change year by year. You can still progress within each of these wage levels based on your experience. Why is the cost of insurance relevant when the employer is providing the medical care? Well, I'd like to make one point. The way you consider whether information is relevant is not based on the employer's field of work. It's based on the union's needs in order to correctly and adequately represent its members. Take it either way you want. I still want to know why it's relevant. No, I understand. You're dealing with an employer who is going to provide the medical care, and you understand that, and so the question is how can the union satisfy or fit within what the case law text that is their right to information. A union is not entitled to anything it wants merely because it's the bargaining representative. It's got to be relevant. So relevance is a matter of context. If you're in a context where the employer is going to provide the medical care, insurance is not the issue. Why does an employer have to break down the books? Because in this case, the employer wasn't just going to provide the medical care. The employer made clear that it was going to hike the costs that it was going to ask each employee to pay for receiving that medical care. It wasn't providing that medical care for free. It said going in, and I'll let Ms. Midovich correct me if I'm wrong, but it said going at some point, the union knew that the employer had done that with another hospital, and then at some point indeed during these negotiations Prime came along and said now going forward, no, we don't want to change our EPO, our PPO system, but we do want employees to pay more. And so in that instance, the union is entitled to know what the costs are so that it can first see if the employer's rates are justified or negotiate concessions elsewhere, or also the union is entitled to propose suggestions, accommodations, changes within the existing insurance framework in order to reduce the cost for its members. And why is the issue not moot as Prime has argued given that you now have successfully negotiated an agreement without the information that you requested? Because that issue wasn't raised in the brief, I cannot rattle off the dozens of bar cases that I'm sure exist that say that you can't just simply say that because you've reached an agreement despite not providing the information. I assume you have a more practical answer, too. I can think of an answer. Quite clearly, because regardless of whether they ultimately reached an agreement, the fact that the employer did not provide the information in question places the union at a disadvantage during the negotiation where it can't, where it's kind of working in the dark, and also it can't be the true bargaining partner that it should be in proposing solutions that are relevant to the circumstances at hand. We're talking really about the remedy when we're thinking about mootness that the contract has already been negotiated. You're not suggesting that the requests for information for example that related to the prior contract are still currently relevant. You're talking about getting an order from the board or holding the order from the board that says the employer violated the act previously. Is that it? Or are you proposing that the remedy would give them the information that they requested with respect to a contract that's already been negotiated? The board's order came out at the time before any contract had been issued, and the board's order is as it stands. If during compliance the employer wants to argue that it's no longer necessary to provide that information, they can. But the board order as it stands say that the employer must provide that information. Is there some sense that the contracts that were subsequently negotiated might have had different terms if this information had been provided before? Again, the record is completely devoid of information on that, but what is clear is that certainly the negotiations would have progressed differently if Prime had been more forthcoming in providing that information when the union requested it. Your answer has to be yes. You don't know in what particular. It sounds like in the new agreement they have agreed not to require co-pays and premiums. That's what I just learned out today. Presumably to get that benefit of value to the employees, which is unknown, that some tacit concessions were made.  I understand what you're saying here. Your bottom line answer to me seemed to be that this is a matter for compliance. As far as the remedy goes, whether Prime should provide the information as ordered by the board, the board's order right now requires Prime to provide that information. If Prime wants to dispute that and get into it... Your answer is that they can raise this, they can contest it during compliance if we agree with your position. They can say that portion of the remedy is inappropriate. Just like reimbursement orders, etc., it changes over time. By the time you get compliance, what someone thought they would get two years ago is not the same now. Your Honor, this is my speculation based on my understanding of the compliance process, but in my limited experience, there is flexibility during the compliance process for employers and unions to work together and resolve issues like that. If the union, however, explains that it still needs the information for one reason or another, then that will have to be sorted out then. I realize my time is up. Did you want an answer to your dual information use? I just wanted to say that the board law on that issue is that unless the employer can show that there is no legitimate use to which the information can be put, the employer has to provide that information. In this case, the kind of guilt by association, frankly, evidence that Prime has put forward really doesn't pass muster. Thank you very much. Guilt? I guess that was part of my question. Is it an illegitimate use the way the SEIU was using the information? We certainly would have argued if UHW was still in this case that it was not, that it was part of a corporate campaign that the board found was perfectly legitimate. Also, we point out that Medicare DRG information data becomes public after a certain time, so this is not information that would not have been available to the union at some point. And then finally, we'd like to point out that that whole bad faith argument really is just a smokescreen because it only addresses it only deals with the Medicare DRG coding information. There's a host of other information that is unrelated to that that Prime did not provide. Thank you very much. We'll hear from the intervener now. May it please the Court, Lisa Domenovich of Bushcott-Leib on behalf of Intervenor Service Employees International Union, Local 121 RN. Good morning. To address the case law on the issue of mootness, the Supreme Court long ago held that just because it takes long for these cases to progress through the process, that it's still and a successor contract is reached that doesn't moot the case and in fact a remedial bargain order is important. And the case is NLRV versus American National Insurance Co., 343 U.S. 395. That case law is clear. We just had one with the FLRA where we relied on the board stuff. That's all clear, but there are particulars that you have to attend to. And as you said, that's at the compliance stage that that's dealt with. What is your strongest argument that you're still entitled to all the information that you sought and that they withheld? The strongest argument is that the contract that was reached in 2014 expires this year. And so we're going to be back at the table. And the health care issue hasn't gone away. Isn't it a forfeiture argument that they didn't timely raise this objection? Absolutely. As to the proprietary, you can't bargaining wouldn't, the whole point of the federal labor law structure is that the union can come and be an equal partner and understand where the employer is coming from on its positions and meaningfully respond. And if you can just raise defenses later on by your lawyers months, years later, that undermines the process that occurs at the table. And maybe we'll let Mr. Kahn respond to this on his rebuttal, but I thought I heard him say that no, they did not raise this objection. That's correct. If you look through the three letters that Ms. Schottmiller raised, nowhere in any of those does she raise proprietary or confidential information. And in fact, in two of the locations she does raise a confidential type of objection. Doesn't that help us that we don't need to get into the particulars as much as we would otherwise? That's correct. Absolutely. It was waived at the time. If you want to raise proprietary, you can, but you need to do it at the table and at that same time raise an accommodation that the union can respond to. It very much needs to be immediate and at the table for this entire process to be successful and be as Congress intended. Raising things years later doesn't make this process work, and so that's why the burden is on the lawyers to say their objections at the time and not lawyer it later. I guess there's a separate, I mean there's sort of two questions that we're talking about at the same time, and one of them is just given the time that passes for everything to be litigated, that it seems like are you seeking information with respect to a very past time, when really now if you went back facing another bargaining session, what you would want is the analogous information, but for what you dealt with in compliance proceedings? Yes, and I think that would be the appropriate place to do it. And certainly it's also important under the U.S. testing case that's cited in the briefs, the union is not limited to the employer's thinking about any topic. We're not limited to the EPO plan that the employer provides. There's very legitimate reasons why an employee wouldn't want to have their colleagues treating them for very embarrassing medical conditions, and so they may not want to be under this EPO plan. And what the analysis is, is health care benefits are a term and condition of employment, or a benefit of employment, and so how you, what you do about it, the union has a right to point out other things, and the GM, Ford not wanting people to buy GM, well absolutely. You don't pay in Ford, you pay in cash, and people are free to choose what they buy. That goes to the whole company town cases that the board has. So people are free to choose how they spend their paycheck, and the important point here is that the challenges raised weren't raised at the time, and even the issue about not being in good faith, that was only to one aspect of the information request. That was only as to the Medicare coding, and frankly it was based on a misunderstanding of what the Medicare coding would represent. In the record, it's very clear that the objection was based on one conversation between Mary Schottmiller and the CNO, where the CNO was concerned about the septicemia campaign aspect of SEIU UHW's campaign, and she just said offhand, this isn't relevant. But it wasn't any kind of thorough analysis or breaking down of that data. Thank you. Mr. Conville will give you about two minutes for rebuttal. Thank you, Your Honors. If there are no questions, we will rest on our briefs. Thank you. Thank you very much. The case is submitted.
judges: Griffith, Pillard, Edwards